1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

14

15

THE TOPLINE CORPORATION, a
Washington Corporation, and REPORT
FOOTWEAR, INC., a Washington
Corporation,

                    Plaintiffs,

v.

4273371 CANADA, INC., a Canadian
Corporation, and MODEXTIL, INC., a
Canadian Corporation, jointly d/b/a REPORT
COLLECTION,

                    Defendants.

C07-938Z

ORDER

16

17

18

19

20

21

22

23

24

25

26

        The Court granted Plaintiffs' motion and entered a Preliminary Injunction, docket no. 37, on August 3, 2007, after having considered Plaintiffs' Motion for Preliminary Injunction, docket no. 3, the submissions of the parties, the record herein, and the law, and having had oral argument on Plaintiffs' Motion, docket no. 3, on August 3, 2007.  The Court now issues this written opinion explaining the basis for the preliminary injunction.

## BACKGROUND

### A.      Present Lawsuit and Motion

        On June 18, 2007, two Washington corporations, The Topline Corporation and its subsidiary, Report Footwear, Inc. (collectively "Topline"), filed suit against two Canadian corporations, 423371 Canada Inc. and Modextil, Inc. (collectively "Modextil"), alleging trademark infringement, unfair competition, and various related claims.  Compl., docket no. 1,  ¶¶ 37-74.  On June 21, 2007, Topline served the Complaint on Modextil and moved for a preliminary injunction to enjoin Modextil's use of the REPORT COLLECTION trademark in connection with the sale of women's apparel, which allegedly infringes on Topline's

ORDER  1–

1  REPORT trademarks for women's footwear.  Pls.' Mot., docket no. 3; Decl. of Service,

2  docket no. 8.  The only motion before the Court is Plaintiffs' Motion for Preliminary

   Injunction, docket no. 3.[1]

3  **B.**   **Registered Trademarks**

4       Topline is the owner of U.S. Registration No. 2,169,637 for REPORT: for "women's

5  shoes," with a "first use" date of March 1993.  Ferron Decl., docket no. 4, ¶ 2, Ex. 1.

   Topline's ownership of the REPORT: mark is incontestable under 15 U.S.C. § 1065.  Id. ¶ 2,

6  Ex. 2.  Topline is also the owner of U.S. Registration No. 3,246,085 for REPORT for

7  "women's footwear and girls' footwear" with a "first use" date of March 1993.  Id. ¶ 3, Ex.

8  3.  These two marks are collectively referred to herein as Topline's "REPORT Marks."[2]

9       Defendant 4273371 Canada, Inc. is the owner of U.S. Registration No. 1,957,041 for

   REPORT COLLECTION for "men's clothing and accessories" with a "priority date" of July

10 21, 1993.  Abitan Decl., docket no. 20, ¶ 3, Ex. A.  Defendant 4273371 Canada, Inc. licenses

11 the REPORT COLLECTION mark to Defendant Modextil.  Abitan Decl. ¶ 23.

   **C.**   **Topline's Sales of REPORT Women's Footwear**

12      Beginning as early as March 1993, Topline has used, and continues to use, its

13 REPORT Marks in connection with the marketing and sale of women's footwear.  Philby

14 Decl., docket no. 5, ¶ 3; Supp. Philby Decl., docket no. 29, ¶ 9.  Topline's REPORT

   women's shoes are sold nationwide through major department stores, including Nordstrom,

15 Macy's, Victoria's Secret and Kohl's, major online retailers, such as Amazon.com,

16 Shoes.com, Zappos.com and VictoriasSecret.com, and other retail women's fashion outlets,

17 such as Eilatan, Peperlime and Kitson.  Philby Decl. ¶ 6; Singh Decl., docket no. 22, ¶ 3, Ex.

   B (Zappos.com).  Topline's REPORT shoes have been sold through Nordstrom and Macy's

18 since 1994.  Philby Decl. ¶ 11.  Topline's wholesale sales of REPORT brand shoes[3] grew

19

20      [1] Although Defendants briefly raise a personal jurisdiction issue in their opposition
   papers, Defendants do not move to dismiss Plaintiffs' complaint for lack of personal jurisdiction.
21 The Court notes that Defendants have sold goods to Washington consumers.  Abitan Decl.,
   docket no. 20, ¶ 23; Ferron Decl., docket no. 4, ¶¶ 13-14, Exs. 11-14.
22

23      [2] The Court does not base its preliminary injunction on Topline's use of a REPORT
   SIGNATURE mark.  Accordingly, the Court's reference to Topline's "REPORT Marks" does
24 not include the REPORT SIGNATURE mark.

25      [3] The wholesale figures presented in Exhibit 3 to the Greenfield Declaration,
   docket no. 33, do not separate out REPORT SIGNATURE brand shoes from REPORT: and
26 REPORT brand shoes; however, at oral argument, Plaintiffs' counsel represented that of the 5.8
   million pairs of REPORT brand shoes sold in the last five years, see Second Supp. Philby Decl.,
   docket no. 31, ¶ 7, only 70,000 (just over 1%) were REPORT SIGNATURE shoes.

ORDER   2–

from approximately $7 million in 2002 to approximately $26 million in 2006.[4]  Greenfield
Decl., docket no. 33, ¶ 6, Ex. 3.  Topline's preliminary wholesale sales figures for REPORT
brand shoes for fiscal year 2007 exceed $30 million, which converts to retail sales in the $70
million range.  Id.  Topline has spent more than $9 million promoting its REPORT Marks
and products, and continues to spend at least $2 million annually advertising and promoting
its REPORT Marks and products.  Philby Decl. ¶ 5.  Topline's REPORT women's footwear
is featured in retailers' advertising materials.  Id. ¶ 8, Exs. 1-3 (Zappos.com, Nordstrom, and
Macy's advertisements, respectively).  Topline's REPORT footwear is also featured in
women's fashion and lifestyle magazines with nationwide circulation.  Id. ¶ 9, Ex. 4.

**D.**   **Topline's Expansion of REPORT Brand into Women's Accessories and Apparel**

In 2004, Topline began offering women's handbags under its REPORT Marks to
retail outlets.  Philby Decl. ¶ 17.  Topline is the owner of approved U.S. Trademark
Application No. 78/430900 for REPORT for "small leather goods," which includes
"women's and girls' handbags," with a filing date of June 7, 2004.  Ferron Decl. ¶ 4, Ex. 4.
Topline does not rely on this trademark application to support its motion for a preliminary
injunction, other than to show Topline's intent to expand into other women's goods, beyond
women's footwear.  Pls.' Mot. at 7 n.1.

Topline's Chief Operating Officer, Richard Philby, has filed a declaration stating that
"Topline plans to sell REPORT brand women's apparel, apparel accessories, purses and
sunglasses in the next 12 to 24 months."  Philby Decl. ¶ 17.  However, in March 2007, Mr.
Philby informed Modextil's President, Mr. Abitan, that "most of the steps toward introducing
Topline's women's apparel line had not been started."  Supp. Philby Decl. ¶ 11.

**E.**   **Complimentary Nature of Women's Footwear and Women's Apparel**

Topline's COO, Mr. Philby, asserts that "[w]omen's footwear, apparel and fashion
accessories are marketed to the same customers through the same marketing channels" and
that "[w]omen often buy shoes and apparel to match one another, often during the same
shopping trip."  Philby Decl. ¶ 12.  Modextil has not challenged these general statements.
Retailers advertise Topline's REPORT women's shoes together with women's apparel.  Id. ¶
13, Exs. 2, 3 (Nordstom and Macy's catalogs, respectively).  Some companies market
women's footwear and women's apparel and accessories under a single mark, such as
Quicksilver, Inc.'s sale of ROXY women's footwear and apparel.  Id. ¶ 14.  Modextil has

---

[4] Topline originally claimed that "[b]y 2004, annual retail sales of women's footwear
under Topline's REPORT Marks exceeded $100 million."  Philby Decl. ¶ 5.  Modextil
challenged the amount, and Topline later conceded that it had erroneously calculated the $100
million figure.  Second Supp. Philby Decl. ¶¶ 2-6.

ORDER  3–

marketed its allegedly infringing women's apparel on its website by pairing it with complimentary women's footwear.  Ferron Decl. ¶ 18, Exs. 18-20.

**F.      Modextil's Sales of REPORT COLLECTION Men's Apparel**

In approximately 1993, Modextil adopted the trademark REPORT COLLECTION and began to use the mark on men's apparel in Canada.  Abitan Decl. ¶ 2.  Upon registering the REPORT COLLECTION mark in 1996, Modextil began to sell men's apparel under the REPORT COLLECTION mark in the United States.  Abitan Decl. ¶ 4.  Annual wholesale sales of REPORT COLLECTION men's apparel in the United States have exceeded $7 million[5] for the last few years.  Id.  Advertising expenses have exceeded $1.25 million for men's apparel sold under the REPORT COLLECTION mark for at least the last three years. Id. ¶ 5.  To date, Modextil has sold its REPORT COLLECTION men's apparel through approximately 770 retailers.  Id. ¶ 4.  In 2000, Modextil began operating a website at www.reportcollection.com featuring REPORT COLLECTION men's apparel.  Id. ¶ 7, Ex. H.

**G.      Modextil's Sales of REPORT COLLECTION Women's Apparel**

"In view of the overwhelming success and the goodwill established with respect to the REPORT COLLECTION mark, on or about July, 2005 [Modextil's President Mr. Abitan] decided to expand [his] business under the REPORT COLLECTION mark to women's wearing apparel."  Abitan Decl. ¶ 9.  On or about November 2005, Modextil hired French designers/merchandisers to design the wearing apparel line, and hired Italian clothing manufacturers to implement the designs.  Id. ¶ 10.  Modextil has invested $1.2 million in this enterprise, including hiring personnel for just this Division.  Id.  A corporate sales force was hired in New York, and contract Sales Agencies were obtained in Dallas, Atlanta, Philadelphia, Chicago, and Los Angeles.  Id.

Modextil first offered for sale REPORT COLLECTION women's apparel in the United States in February 2006 at trade shows in New York, New York and Las Vegas, Nevada.  Id. ¶ 11.  Modextil participated in a dozen or more shows thereafter, for a total investment in excess of $275,000.  Id.  Shipments of women's apparel under the REPORT COLLECTION mark through December 2006 amounted to over $100,000 at wholesale.  Id. ¶ 13.

In 2006 and 2007, Modextil released publications, information, and advertisements of REPORT COLLECTION women's apparel.  Id. ¶ 12, Ex. J (representative advertisements of

---

[5] All monetary figures are given in U.S. currency, even though Defendants are Canadian corporations.

men's and women's apparel).  Three catalogs including women's apparel have been distributed and another one is about to be distributed, representing a total investment of $200,000.  Id. ¶ 12, Exs. K, K-1, L.  Since the fall of 2006, Modextil's REPORT COLLECTION women's apparel has been advertised on Modextil's website, www.reportcollection.com.  Id. ¶ 17.  Purchases online have only been made possible in the last few months through www.shopreportcollection.com.  Id.  Modextil has invested over $80,000 in its shopping website.  Id.  Modextil's customers' websites also feature REPORT COLLECTION women's apparel.  Id. ¶ 7, Ex. I-1 (shop.laepocamiami.com).

After analyzing the overwhelming response to its initial launch and gauging the market, Modextil increased by the quality of the material and design for its Fall 2007 line. Id. ¶ 18.  The retail price point for its Fall 2007 line ranges between about $150-600.  Id. Mr. Abitan asserts that its Fall 2007 line "will be sold through the better departments in the various upscale stores."  Id.

Modextil's use of the REPORT COLLECTION mark consistently shows "REPORT" in larger type than "COLLECTION."  See, e.g., Ferron Decl., Exs. 12, 13, 14; Supp. Ferron Decl., docket no. 28, ¶ 6, Ex. 4.  Mr. Abitan admits that since Modextil's inception, the company has used only the form of the REPORT COLLECTION mark where "REPORT" is in larger type than "COLLECTION."  Abitan Decl. ¶ 6.[6]

Modextil has occasionally used the word REPORT by itself in connection with the company's advertisements of women's apparel on its website, Ferron Decl. ¶ 16, Exs. 15, 16, as well as in a recent recruiting advertisement for sales executives.  Supp. Ferron Decl. ¶ 5, Ex. 3 (June 18, 2007 advertisement in *Women's Wear Daily*).  Modextil labels its garments with REPORT COLLECTION on the garment label and on hang tags.  Id. ¶ 14.  In the past, Modextil used hang tags on its women's apparel with the designation "REPORT," as opposed to "REPORT COLLECTION;" however, Modextil has stopped using the word "REPORT" alone on hang tags.  Id.

**H.    Anticipated Impact of Preliminary Injunction on Modextil's Sales and Reputation**

Mr. Abitan describes how Modextil's sales and reputation would be impacted by a preliminary injunction:

> At present, Modextil has in excess of U.S. $500,000 in REPORT
> COLLECTION women's wear representing booked sales for its Fall
> 2007 line to be shipped to about 160 new accounts and $230,000 in

---

[6] The one exception in the record is a reproduction of Modextil's website, as it was in 2002, which shows Modextil's prior use of REPORT COLLECTION with "REPORT" and "COLLECTION" being the same size.  Supp. Ferron Decl. ¶ 14, Ex. 7.

ORDER  5–

apparel to be sold during this season. It also has approximately $250,000 in its Spring line inventory. This amounts to approximately $2.1 Million at retail. Shipments of the Fall line begin at the end of July, 2007.[7] If Modextil is not permitted to ship these goods, the result will be disastrous and could not be adequately compensated for in damages. As noted, many of the customers for women's wear are new customers for Modextil. If the goods are not timely delivered, the orders will be canceled. Modextil will obtain a reputation that they cannot deliver on time, which will affect not only future orders from the present customers, but, through word of mouth, will affect future orders from other parties. Modextil's substantial investment in this entire division will be lost. This will also affect Modextil's men's wear business since it is almost impossible to eliminate a bad reputation in the wearing apparel industry. Moreover, Modextil will still have to pay its women's wear Division employees and the commission earned by its Agents.

Abitan Decl. ¶ 19.

# DISCUSSION

## A.    **Preliminary Injunction Standard**

A preliminary injunction is appropriate where the movant can demonstrate either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003) (citation omitted). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Sammartano v. First Jud. Dist. Ct., 303 F.3d 959, 965 (9th Cir. 2002) (citation omitted). "In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." Id. (citation omitted).

## B.    **Analysis**

### 1.    **Likelihood of Success on the Merits**

To prevail on a trademark infringement claim under section 32 of the Lanham Act or an unfair competition claim under section 43(a) of the Lanham Act, Topline must show: (1) "that it owns a valid mark, and thus a protectable interest," and (2) "that the alleged infringer's use of the mark 'is likely to cause confusion.'" KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 602 (9th Cir. 2005) (quoting 15 U.S.C. § 1114(1)(a)); see also Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1140 (9th Cir. 2002)

---

[7] In light of the pending Plaintiffs' Motion for Preliminary Injunction, Modextil agreed to postpone its shipment date to August 6, 2007.

ORDER  6–

(quoting 15 U.S.C. § 1125(a)(1)); Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1046 n.6 (9th Cir. 1999).

### a.  **Validity of Trademark**

Topline argues, correctly, that its federal trademark registrations and the incontestable status of its REPORT: mark create a presumption of ownership and validity of its REPORT Marks.  See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 117 (2004) (quoting 15 U.S.C. § 1115(b)) (. . . "an incontestable registration is 'conclusive evidence . . . of the registrant's exclusive right to use the . . . mark in commerce'"); Brookfield, 174 F.3d at 1047 (citing 15 U.S.C. §§ 1057(b) and 1115(a)) ("[R]egistration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark on the good and services specified in the registration.").  "Federal registration of a trademark endows it with a strong presumption of validity . . . includ[ing] the specific presumption that the trademark is not generic."  KP Permanent Makeup, 408 F.3d at 604 (internal citation and quotation omitted).  Topline's federal registrations of its REPORT: and REPORT marks shift the burden to defendant "to produce sufficient evidence to overcome the presumption" of validity of these marks.  Id.  Although Modextil contests the validity of Topline's REPORT SIGNATURE mark, which is not at issue here (see Footnote 2), Modextil does not provide any evidence to overcome the presumption of validity of Topline's REPORT: and REPORT marks.  Accordingly, Topline is likely to succeed in showing "that it owns a valid mark, and thus a protectable interest" under the Lanham Act for its REPORT: and REPORT marks.  KP Permanent Make-Up, 408 F.3d at 602.

### b.  **Likelihood of Confusion**

The likelihood of confusion determination asks "whether the similarity of the marks is likely to confuse customers about the source of the products."  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000) (internal citation and quotation omitted).  The alleged infringer's "use of a mark must be likely to confuse an *appreciable* number of people as to the source of the product . . . that there are a few consumers who do not pay attention to obvious differences and assume common sources where most other people would not, may not demonstrate the requisite likelihood of confusion."  Entrepreneur, 279 F.3d at 1151 (emphasis in original).  "In determining whether confusion between related goods is likely, the following factors are relevant: 1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines."  AMF, Inc.

v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979) (abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 810 n.19 (9th Cir. 2003)). "The Sleekcraft factors are . . . a guide to decision-making, intended to channel the analytical process, but not dictate any result." Entrepreneur, 279 F.3d at 1141 (internal citation and quotation omitted). "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." Brookfield, 174 F.3d at 1054. "Although some factors – such as the similarity of the marks and whether the two companies are direct competitors – will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." Id.; see also GoTo.com, 202 F.3d at 1205 (similarity of marks, relatedness of goods, and marketing channels found to be the three most important Sleekcraft factors in the context of the web).

### i.     **Strength of the Mark**

"Trademarks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1080 (9th Cir. 2005) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)). "A generic mark is the least distinctive, and an arbitrary or fanciful mark is the most distinctive." Id. (citing GoTo.com, 202 F.3d at 1207). "The more distinctive a mark, the greater its conceptual strength; in other words, a mark's conceptual strength is proportional to the mark's distinctiveness." Id. "A suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success." Id. at 1081 (collecting Ninth Circuit cases).[8] However, the Ninth Circuit has "never held that an arbitrary or fanciful mark (i.e., a conceptually strong mark) can have its overall strength diminished by feeble commercial success." Id. Rather, the Ninth Circuit "hold[s] that a lack of commercial strength cannot diminish the overall strength of a conceptually strong mark so as to render it undeserving of protection." Id. "Otherwise, a mark which is conceptually strong may never have the opportunity to blossom into its full commercial potential through effective marketing." Id.

Modextil does not challenge Topline's assertion that its REPORT Marks are arbitrary or fanciful, and thus conceptually strong and deserving of protection. Rather, Modextil challenges Topline's assertions of commercial success, namely Topline's $100 million retail sales figure (see Footnote 4) and Topline's $9 million in advertising expenditures, as being

---

[8] In other words, "[m]arks which are . . . not inherently distinctive . . . may acquire the distinctiveness which will allow them to be protected under the [Lanham Act]." Two Pesos, 505 U.S. at 769. "This acquired distinctiveness is generally called 'secondary meaning.'" Id.

only $650,000 per year over 14 years.  Modextil's argument is not well taken because <u>M2 Software, Inc. v. Madacy Entm't</u> teaches that the strength of Topline's REPORT Marks cannot be diminished by limited commercial success.  The Ninth Circuit, albeit in an unpublished case, has gone so far as to assign error to a district court's consideration of a plaintiff's sales and advertising in determining the strength of plaintiff's "M2" mark, noting that "arbitrary and fanciful marks are inherently strong."  <u>M2 Software, Inc. v. M2 Commc'ns, L.L.C.</u>, 76 Fed.Appx. 123, 124 (9th Cir. 2003) (citing <u>Dreamwerks Prod. Group, Inc. v. SKG Studio</u>, 142 F.3d 1127, 1130 (9th Cir. 1998)).

Modextil also argues that Topline has failed to demonstrate the strength of its REPORT Marks through a consumer recognition survey.  Defs.' Opp'n, docket no. 18, at 14 (citing <u>Clicks Billiards, Inc. v. Sixshooters, Inc.</u>, 251 F.3d 1252, 1262 (9th Cir. 2001) and <u>Levi Strauss & Co. v. Blue Bell, Inc.</u>, 778 F.2d 1352, 1358 (9th Cir. 1985)).  In both <u>Clicks Billiards</u> (a trade dress case) and <u>Levi Strauss</u> (a trademark case), however, the plaintiff had to prove secondary meaning to demonstrate an acquired distinctiveness of a not inherently distinctive mark, which is not the case here due to the arbitrary or fanciful nature of the REPORT Marks and their inherent distinctiveness.  <u>See</u> <u>M2 Software, Inc. v. Madacy Entm't</u>, 421 F.3d at 1081; 2 J. McCarthy, *Trademarks and Unfair Competition* § 11:1 (4d ed. 2007) ("no secondary meaning required" for "inherently distinctive" "arbitrary and fanciful" trademarks).  At oral argument, Modextil relied on <u>Brookfield</u> in support of its argument that Topline's "glaring absence of [a consumer recognition] survey further negates a finding that its REPORT mark[s] [are] strong."  Defs.' Opp'n at 14.  <u>Brookfield</u> involved a suggestive, not an arbitrary or fanciful, mark.  <u>See</u> <u>Brookfield</u>, 174 F.3d at 1058.  Thus, the discussion in <u>Brookfield</u> of how "advertising expenditures can transform a suggestive mark into a strong mark, where, for example, that mark has achieved actual marketplace recognition," <u>id.</u>, is not applicable to the present case.

In conclusion, the "strength of the mark" <u>Sleekcraft</u> factor favors Topline because Topline's REPORT Marks are arbitrary or fanciful, and thus inherently distinctive, conceptually strong, and deserving of trademark protection.

### ii.     **Proximity of the Goods**

"When dealing with the second <u>Sleekcraft</u> factor, the courts assess whether the goods are related or complementary."  <u>M2 Software, Inc. v. Madacy Ent'mt</u>, 421 F.3d at 1081-82 (citing <u>Sleekcraft</u>, 599 F.2d at 350).  "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists."  <u>Sleekcraft</u>, 599 F.2d at 350.  "The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding

of likelihood of confusion." <u>Id.</u> (citations omitted). "Thus, less similarity between the marks will suffice when the goods are complementary, [such as] . . . drill bits and drill bushings, [or] the products are sold to the same class of purchasers, or the goods are similar in use and function." <u>Id.</u> (internal citations and quotations omitted).

Topline argues that women's footwear and women's apparel are complementary goods, sold and advertised to the same class of purchasers, as evidenced by retailer advertising of Topline's shoes along side women's apparel and by Modextil's own marketing efforts to sell its apparel as complimentary with certain shoe styles. Topline also relies on a decision of the U.S. Patent and Trademark Office ("USPTO") Trademark Trial and Appeal Board ("TTAB"), which found that women's shoes and women's apparel are related and complementary goods because "[a] women's ensemble, which may consist of a coordinated set of pants, a blouse and a jacket, is incomplete without a pair of shoes which match or contrast therewith," and "[s]uch goods are frequently purchased in a single shopping expedition." <u>In re Melville</u>, 18 U.S.P.Q. 2d 1386, 1388 (T.T.A.B. 1991) (denying application to register the ESSENTIALS mark for women's shoes in light of the registered ESSENTIALS mark for women's clothing based on a finding of likelihood of confusion.). Topline also relies on a case in which a company was preliminarily enjoined from using the name MISS VILLAGER on women's shoes in light of another company's federal registrations of THE VILLAGER and JUNIOR VILLAGER marks for women's apparel. <u>The Villager, Inc. v. Dial Shoe Co.</u>, 256 F. Supp. 694, 701 (E.D. Pa. 1966) (finding women's shoes related to women's apparel for trademark purposes, noting that many companies sell under one mark complete lines of apparel including shoes, and that shoes and wearing apparel are sold, advertised, and worn together). Modextil ignores this <u>Sleekcraft</u> factor and the <u>In re Melville</u> and <u>The Villager</u> cases in its likelihood of confusion analysis, impliedly conceding that women's footwear and women's apparel are related and complementary goods. Defs.' Opp'n at 14 (discussing "similarity of marks" <u>Sleekcraft</u> factor #3 after "strength of mark" <u>Sleekcraft</u> factor #1).[9] In conclusion, the "proximity of the goods" <u>Sleekcraft</u> factor indisputably favors Topline.

### iii.    **Similarity of the Marks**

"Similarity of the marks is tested on three levels: sight, sound, and meaning." <u>Sleekcraft</u>, 599 F.2d at 351 (citation omitted). "Each must be considered as they are

---

[9] Modextil's assertion that men's apparel and women's apparel are related goods, Defs' Opp'n at 19, is irrelevant to the likelihood of confusion analysis. The issue before the Court is whether Modextil's allegedly infringing use of the REPORT COLLECTION mark for women's apparel is likely to confuse customers that the source of the women's apparel is Topline, due to Topline's use of its REPORT Marks for women's footwear.

ORDER   10–

1   encountered in the marketplace."  Id.; Nutri/Sys., Inc. v. Con-Stan Indus., Inc., 809 F.2d 601,

2   605-606 (9th Cir. 1987) (affirming finding that Nutri/System and Nutri-Trim logos are

3   dissimilar as used in marketplace).  "Although similarity is measured by the marks as

    entities, similarities weigh more heavily than differences."  Sleekcraft, 599 F.2d at 351

4   (citation omitted).

5       Topline uses the word "REPORT," sometimes accompanied by a stylized "R" logo.

6   Singh Decl. ¶¶ 2-3, Ex. A Ex. B at 28-36; Philby Decl. ¶ 8, Ex. 2 at 2.  Modextil uses the

    words "REPORT COLLECTION," usually in white lettering against a red background.

7   Abitan ¶ 6, Ex. G.[10]  Both companies use capital letters.  When an alleged infringer uses

8   multiple words, in contrast to a single word used by the trademark owner, the Ninth Circuit

9   asks whether "[t]hese other words are significant words, indicating a different origin."  Alpha

    Indus., Inc. v. Alpha Steel Tube & Shapes, Inc., 616 F.2d 440, 444 (9th Cir. 1980) (affirming

10  finding that ALPHA, used alone, and ALPHA STEEL TUBE or ALPHA STEEL TUBE &

11  SHAPES, are not similar marks because steel, tube, and shapes are significant words

12  indicating different origin).  One dictionary definition of "collection" is "a number of objects

    or persons or a quantity of a substance that has been collected or has collected often

13  according to some unifying principle or orderly arrangement," such as "apparel that is

14  displayed for sale in a particular season (as by a particular designer)."  Webster's Third New

15  Int'l Dictionary at 444 (1981).  Modextil's use of the word "collection" does not add any

    significant meaning to "report" to indicate a different origin.  In addition, the sight of

16  "collection" is not significant in light of Modextil's admission that it uses "REPORT . . . in

17  larger type than COLLECTION."  Abitan Decl. ¶ 6.  Courts have repeatedly found marks to

18  be similar where the dominant portion is identical.  See Pac. Telesis Group v. Int'l Telesis

    Commc'ns, 994 F.2d 1364, 1365, 1367-69 (9th Cir. 1993) (affirming finding that "Telesis" is

19  dominant component of the "Pacific Telesis Group" mark, where advertisements typically

20  displayed "Pacific Telesis" in larger type than "Group," and where "Telesis" is arbitrary as

    applied to telecommunication services and is a rarely used word); E. & J. Gallo Winery v.

21  Gallo Cattle Co., 967 F.2d 1280, 1291-92 (9th Cir. 1992) (affirming finding that the shared

22  dominant element of GALLO demonstrated similarity between "Gallo Salame" and "Gallo

23  cheese" or "Joseph Gallo" cheese); The Villager, 256 F. Supp. at 697, 704-705 (finding that

    the addition of the word MISS is not sufficient to distinguish the goods of the Defendant

24  _____

25      [10] Modextil has used REPORT alone on hang tags and on its website, but these instances
    seem to be relatively rare uses in the marketplace, particularly in light of Modextil's agreement
26  to discontinue the use of REPORT hang tags.  Modextil's use of REPORT alone is not given
    much weight in the Court's determination that Topline is likely to be able to show a likelihood
    of confusion.

ORDER   11–

from those of the Plaintiff so as to avoid confusion, where VILLAGER is the dominant feature of Plaintiff's THE VILLAGER and JUNIOR VILLAGER marks and Defendant's use of the MISS VILLAGER mark displays the name VILLAGER in large, bold lettering and VILLAGER has much greater prominence than the word MISS).

Here, Modextil and Topline use the identical dominant component "REPORT," in capital letters, in their respective marks, and Modextil's use of the word "COLLECTION" does not carry any significant meaning. Accordingly, the marks are similar, and the "similarity of the marks" Sleekcraft factor favors Topline.[11]

### iv.     Evidence of Actual Confusion

"While evidence that the use of the two marks has already led to confusion is persuasive proof that future confusion is likely, the converse is not true." GoTo.com, 202 F.3d at 1208 (internal quotation and citation omitted). Topline provides no evidence of actual consumer confusion. Modextil argues its REPORT COLLECTION mark has coexisted in the United States with Topline's REPORT mark for at least eleven years without any evidence of consumer confusion. However, Modextil's eleven years of REPORT COLLECTION sales have been limited, until 2006, to men's apparel. Modextil first offered for sale REPORT COLLECTION women's apparel in the United States in February 2006 at trade shows in New York, New York and Las Vegas, Nevada. The "actual confusion" Sleekcraft factor is not particularly relevant here, because Topline had little, if any, opportunity to collect information on actual confusion. See Brookfield, 174 F.3d at 1060 (finding factor to be irrelevant where the plaintiff "never had the opportunity to collect information on actual confusion" because the suit was filed before the defendant used the allegedly infringing mark).

### v.     Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." Sleekcraft, 599 F.2d at 353. The issue is not only whether "both lines [a]re sold under the same roof," but also whether the marketing channels are "parallel" such that "the general class of . . . purchasers exposed to the products overlap." Id. In Sleekcraft, the Ninth Circuit looked for

---

[11] In the similarity of the marks analysis, Modextil argues that in separate proceedings before the USPTO between Topline and another company, Fin Ing., that Topline denied allegations that REPORT and REPORTER are similar marks. Defs.' Opp'n at 8-9, 16:1-2, n. 5; Fields Decl., docket no. 21, ¶¶ 11-12, Exs. J and K. Topline responds that the marks and goods at issue in the Fin Ing. oppositions were different, and that Modextil has not attempted to show that the elements of estoppel are satisfied. Pls.' Reply, docket no. 27, at 6:16-24. At this time, the Court does not have sufficient information about Topline's position taken in those proceedings to make any findings related to those proceedings that affect the Court's likelihood of confusion determination.

ORDER   12–

similarities in sales methods employed, price ranges, and advertising and retail methods. <u>See</u> <u>id.</u>; <u>see also</u> <u>Cohn v. Petsmart, Inc.</u>, 281 F.3d 837, 842 (9th Cir. 2002) (finding that marketing efforts are concentrated in different media, where Plaintiff obtains most customers through yellow pages listings, while Defendant promotes itself through television advertising, newspaper inserts, and a Web site).

The Court notes that both parties use the Internet for marketing. "Some use of the Internet for marketing, however, does not alone and as a matter of law constitute overlapping marketing channels." <u>Entrepreneur</u>, 279 F.3d at 1151. "The proper inquiries are whether both parties use the Web as a *substantial* marketing and advertising channel, whether the parties' marks are utilized in conjunction with Web-based products, and whether the parties' marketing channels overlap in any other way." <u>Id.</u> (internal quotations and citations omitted) (emphasis in original). Both Topline and Modextil sell their products online, through their own websites as well as through other online retail outlets (e.g., Topline's REPORT shoes on www.reportshoes.com, www.amazon.com, www.shoes.com, www.zappos.com and www.victoriassecret.com; Modextil's REPORT COLLECTION women's apparel on www.shopreportcollection.com and http://shop.laepocamiami.com). In the absence of any evidence from either party on the relative importance of the Internet as compared to other advertising methods, the common presence on the web, generally, only slightly favors Topline.

In the bricks and mortar world, the parties dispute whether Modextil plans to sell to Macy's in the Fall 2007, <u>compare</u> Abitan Decl. ¶ 24, <u>with</u> Supp. Philby Decl. ¶ 10; however, it is undisputed that both Topline and Modextil sell to major department stores. Philby Decl. ¶¶ 6, 11; Supp. Ferron Decl. ¶ 5, Ex. 3 (Modextil's June 18, 2007 recruitment of "connected individuals with major Department Store and better Specialty Store relationships" for its women's and men's divisions); Defs.' Opp'n at 18:9-11 (referring to sales through department stores). Although Mr. Abitan states that Modextil is poised to ship its REPORT COLLECTION women's line to 160 new accounts, Abitan Decl. ¶ 19, Modextil is notably silent on identifying any of these customers, thus precluding any meaningful analysis of whether the exact same marketing channels are being used.

Modextil asserts that the price point of its Fall 2007 REPORT COLLECTION women's apparel line ranges from $150 to $600, whereas Topline's REPORT footwear appears to range from $29 to at most $70 in a few instances, and argues that "it is unlikely that shoppers will encounter both products in the same stores or even the same sections of department stores in view of the different price points." Defs.' Opp'n at 9-11. At oral argument, Topline contended that Modextil's price range is overstated, and noted that

Modextil's own website is offering its women's apparel at fifty percent off, thus bringing many items under $100. The Court examined the record for evidence of Modextil's prices. In an October 2006 article, Modextil's designer was quoted as saying the price range for its women's apparel will be $95 to $275. Abitan Decl. ¶ 12, Ex. J at 38. This comports with the prices listed by one online retailer. Abitan Decl. ¶ 7, Ex. I-1 (prices ranging from $92 to $264). There is insufficient evidence regarding a price differential to support a conclusion that Topline's REPORT footwear is geared to mass-merchandise stores whereas Modextil's REPORT COLLECTION women's apparel is geared to more exclusive stores. Cf. Giorgio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp., 869 F. Supp. 176, 184 (S.D.N.Y. 1994) (different marketing channels where defendant's perfume sold in mass-merchandise stores whereas plaintiff's perfume sold in more exclusive stores). Modextil failed to submit evidence to the Court identifying its customer base, which would have perhaps enabled such a finding, and the evidence submitted by Topline demonstrates convergent marketing channels.

Because both parties sell their products online and through major department stores to the same general class of purchasers (i.e., young women), the "marketing channels" Sleekcraft factor favors Topline.

### vi. Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser

Neither party discusses this Sleekcraft factor, and therefore it plays no part in the Court's analysis of the likelihood of confusion.

### vii. Modextil's Intent in Selecting the Mark

"[W]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, the public will be deceived." Sleekcraft, 599 F.2d at 354. However, "an intent to confuse customers is not required for a finding of trademark infringement." Brookfield, 174 F.3d at 1059. "Thus, the intent factor, if present, will weigh heavily in favor of finding a likelihood of confusion but, if absent, will generally have no effect. eAcceleration Corp. v. Trend Micro, Inc., 408 F. Supp. 2d 1110, 1117 (W.D. Wash. 2006) (citing Brookfield, 174 F.3d at 1059). In this case, Nancy Nicolas, the President of Modextil's Report Collection Division, states that she learned of Topline's brand REPORT for footwear in 1998 or 1999, Nicolas Decl., docket no. 19, ¶ 7, which is well before Modextil decided to expand its business to women's apparel in 2005. Abitan Decl. ¶ 9. Notwithstanding this actual knowledge, Topline has not argued that Modextil knowingly adopted a mark similar to Topline's mark, and the Court will not so find. Modextil asserts that it has been selling REPORT COLLECTION men's apparel in the

ORDER  14–

United States for over eleven years, and that it is a natural expansion to move into women's apparel under the same brand. Nicolas Decl. ¶¶ 15-18; Abitan Decl. ¶ 9; Fields Decl., docket no. 21, ¶¶ 14-17, Exs. M-P. This "intent" Sleekcraft factor is neutral. See Go.To.com, 202 F.3d at 1208 (affirming preliminary injunction despite lack of intent, "emphasiz[ing] the minimal importance of the intent factor").

### viii.     Likelihood of Expansion of the Product Lines

"[A] strong possibility of expansion into competing markets weighs in favor of a finding of infringement." Gallo, 967 F.2d at 1293. Where there is an absence of evidence that expansion is likely to occur, this Sleekcraft factor does not favor either party. eAcceleration, 408 F. Supp. 2d at 1118. Topline argues that its expansion, in 2004, into REPORT women's handbags demonstrates Topline's intent to expand the use of its REPORT mark beyond women's footwear. Topline's COO, Mr. Philby, states that "Topline plans to sell REPORT brand women's apparel, apparel accessories, purses and sunglasses in the next 12 to 24 months." Philby Decl. ¶ 17. Mr. Philby's supplemental declaration admits that in March 2007 he "may have indicated [to Modextil's President, Mr. Abitan] that most of the steps towards introducing Topline's women's apparel line had not been started." Supp. Philby Decl. ¶ 11. Although Topline has presented some evidence of a likelihood of expansion into women's apparel, it is weak, and the Court cannot find that there is a "strong possibility" of expansion into competing markets based on Topline's evidence.

### ix.     Conclusion Re: Likelihood of Confusion

The following Sleekcraft factors favor Topline: the strength of the mark, the proximity of goods, the similarity of the marks, and the marketing channels used. Specifically, the Court finds that Topline is likely to be able to show that Topline's REPORT Marks are arbitrary or fanciful, and thus inherently distinctive, conceptually strong, and deserving of trademark protection; that women's footwear and women's apparel are complementary goods, sold and advertised to the same class of purchasers; that Modextil and Topline use the identical dominant component "REPORT," in capital letters, in their respective marks; that Modextil's use of the word "COLLECTION" does not carry any significant meaning; and that both parties sell their products online and through major department stores to the same general class of purchasers (i.e., young women). There is no evidence of actual confusion or of Modextil's intent to confuse customers by knowingly adopting a mark similar to Topline's mark. And there is not a "strong possibility" of Topline's expansion into women's apparel. Thus, the actual confusion, intent, and expansion Sleekcraft factors are "neutral" in that they do not help Topline prove a likelihood of confusion. Overall, however, the analysis of the Sleekcraft factors demonstrates that Topline is likely to be able to show a likelihood of

ORDER   15–

confusion.  See Brookfield, 174 F.3d at 1053 n.15 (emphasizing that plaintiff's burden at the preliminary injunction stage is to "establish that it is likely to be able to show . . . a likelihood of confusion").

### c.   Conclusion Re: Likelihood of Success on the Merits

Topline is likely to succeed on the merits in showing that it owns valid REPORT: and REPORT trademarks for women's shoes, and in showing a likelihood of consumer confusion as a result of Modextil's use of the REPORT COLLECTION trademark on women's apparel.

### 2.   Irreparable Harm

"In a trademark infringement claim, irreparable injury may be presumed from a showing of likelihood of success on the merits." GoTo.com, 202 F.3d at 1205 n.4 (internal citation and quotation omitted).  "This presumption effectively conflates the dual inquiries [for a preliminary injunction motion]. . . into the single question of whether the plaintiff has shown a likelihood of success on the merits." Id.  "[A] defendant cannot, by asserting the adequacy of money damages, rebut the presumption of irreparable harm." Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 827 (9th Cir. 1997) (a copyright infringement action).

In an effort to rebut the presumption of irreparable harm, Modextil argues that Topline's delay in seeking a preliminary injunction undermines its claim of irreparable harm.[12]  "[C]ourts have held that a delay in seeking injunctive relief will undercut the presumption of irreparable harm in trademark cases." eAcceleration, 408 F. Supp. 2d at 1122 (citing GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984)).  In eAcceleration, this Court denied a preliminary injunction where the plaintiff submitted a cease and desist letter, but then waited approximately nine months before filing suit, and two additional months before bringing its motion for a preliminary injunction.  Id.  This Court recognized that some portion of the delay was likely the result of attempts to resolve the matter without litigation, but noted that plaintiff waited until September 2005 to file the complaint, and until November 2005 to file the motion for a preliminary injunction, despite the fact that the defendant indicated its unwillingness to cease in using the allegedly infringing mark in Spring 2005.  Id. n.4.

In the present case, Topline has not filed a declaration stating when it first learned of Modextil's expansion into women's apparel.  Modextil asserts that Topline should have known about Modextil's expansion into REPORT COLLECTION women's apparel in early

---

[12] After oral argument, Modextil filed a letter with the Court, docket no. 36, clarifying that Modextil's argument regarding Topline's delay and irreparable harm is separate and distinct from the equitable defense of laches, which Modextil does not contend applies for purposes of Plaintiffs' motion for a preliminary injunction.

ORDER   16–

1   2006 due to Modextil's presence at trade shows in February 2006, and due to Modextil's

2   April 2006 advertisement in Menswear Retailing, which noted the launch of REPORT

3   COLLECTION WOMEN, and other advertisements.  Abitan Decl. ¶¶ 5, 11, 12, Ex. J at 2,

4   35, 49, 51-52.  The Court does not have sufficient evidence about these trade shows or

    advertisements to find that Topline should have known about Modextil's plans in early 2006.

5       It is undisputed that as of August 4, 2006, as the result of a telephone conversation

6   between counsel for Topline and counsel for Modextil, Topline was aware of Modextil's

7   intent to use the REPORT COLLECTION mark on women's apparel.  Supp. Ferron Decl. ¶

8   10.  Modextil argues that Topline should have immediately brought suit, and that the ten

    month delay between August 2006 and the filing of the lawsuit in June 2007 rebuts the

9   presumption of irreparable harm.  In order to determine whether the presumption of

10  irreparable harm should be rebutted as a result of Topline's ten-month "delay" in filing suit,

    the Court must examine the activities of the parties in the interim.

11      First, it is noteworthy that Modextil does not contest Topline's assertion that during

12  the telephone conversation on August 4, 2006, Topline's counsel, Mr. Ferron, "advised

    Modextil's counsel that Topline objected to any use of REPORT COLLECTION on

13  women's goods."  Supp. Ferron Decl. ¶ 10.

14      In September and December 2006, in proceedings before the USPTO, Topline

15  opposed Modextil's intent to use application Serial No. 78/812174 for INTERNATIONAL

    REPORT covering various clothing items for both men and women based on a likelihood of

16  confusion with Topline's REPORT Marks.  Ferron Decl. ¶ 9.  Although the allegedly

17  infringing mark is different (i.e., INTERNATIONAL REPORT versus REPORT

    COLLECTION), Topline's opposition should have put Modextil on notice of Topline's

18  objections to Modextil's use of marks similar to its REPORT Marks in the women's apparel

19  market.

20      On February 22, 2007, Topline sent Modextil a formal demand letter.  Ferron Decl. ¶

21  10, Ex. 9; Supp. Ferron Decl. ¶ 11.  This followed a January 2007 email invitation from Mr.

    Abitan of Modextil to Topline business executives to meet face-to-face at an upcoming trade

22  show and discuss the companies' "conflicting brands."  Supp. Ferron Decl. ¶ 11.  In the

23  demand letter, Topline stated that "your client's suggestion that REPORT limit its activities

    to footwear and allow your client to use REPORT COLLECTION for men's *and women's*

24  clothing is not workable," and Topline asked Modextil to adopt a new brand that does not

25  include REPORT for women's goods.  Ferron Decl. ¶ 10, Ex. 9 at 2 (emphasis in original).

26      On March 7, 2007, during a business meeting, Mr. Philby asserts that he advised Mr.

    Abitan that "Topline objected to Modextil's use of any marks containing REPORT by

ORDER  17–

Modextil in connection with women's apparel." Supp. Philby Decl. ¶¶ 10, 13; <u>see</u> <u>also</u>
Abitan Decl. ¶ 21 (acknowledging meeting). Mr. Philby represents that he also objected in
emails sent to Modextil in March and April 2007. Supp. Philby Decl. ¶ 13. Modextil sent
Topline a letter dated March 13, 2007, declining to respond to Topline's February 22, 2007
demand letter in light of "the principals of our respective clients [who] are presently
discussing an amicable resolution of this matter." Ferron Decl. ¶ 13, Ex. 10.

On April 4, 2007, Mr. Philby received an email from Mr. Abitan threatening "a long
and costly affair" if Topline went forward with *Topline's* plans to sell women's clothing.
Supp. Philby Decl. ¶ 12, Ex. 1. Mr. Abitan further stated that "at this point we are not ready
to give up our established 'women's' business." <u>Id.</u> In May 2007, Mr. Philby sent a letter to
Modextil's counsel reiterating Topline's objections to Modextil's planned use of REPORT
COLLECTION on women's goods. Supp. Ferron Decl. ¶ 12; Abitan Decl. ¶ 22. On June 5,
2007, Mr. Philby received a letter from Mr. Abitan, rejecting in no uncertain terms Topline's
settlement overtures and indicating Modextil's unwillingness to cease using the REPORT
COLLECTION mark for women's apparel. Supp. Philby Decl. ¶ 14, Ex. 2. Approximately
two weeks later, on June 21, 2007, Topline served its Complaint and Motion for a
Preliminary Injunction on Modextil.

In contrast to <u>eAcceleration</u>, Topline did not delay in filing suit once Modextil
indicated its unwillingness to cease using the REPORT COLLECTION mark for women's
apparel. Topline served its Complaint and Motion for Preliminary Injunction on June 21,
2007, approximately two months after Mr. Abitan, on April 4, 2006, indicated in a brief
email that Modextil was unwilling "to give up [its] established women's business," and
approximately two weeks after Mr. Abitan, on June 5, 2007, indicated in a letter that
Modextil was unwilling to settle the dispute and unwilling to cease using the allegedly
infringing mark. Prior to April 2007, Modextil had not indicated its unwillingness to change
its plans, and, in fact, in March 2007, formally declined to respond to Topline's February
2007 demand letter. Topline cannot be faulted for Modextil's failure to respond to Topline's
February 2007 demand letter, which clearly outlined Topline's objections to Modextil's
plans. In addition to communicating with Modextil in an attempt to resolve the dispute
without litigation, Topline also spent time during this ten month period between August 2006
and June 2007 investigating the extent of Modextil's use of the allegedly infringing mark by
purchasing items through Modextil's website and by hiring a private investigator to
determine whether and where Modextil was selling women's goods. Ferron Decl. ¶ 12;
Supp. Ferron Decl. ¶ 13. While it is important for trademark owners to promptly initiate
litigation and move for a preliminary injunction once it is clear that their rights are being

threatened, the Court does not want to discourage parties from attempting to resolve their disputes without court intervention or from gathering sufficient evidence to support their allegations.

In conclusion, Topline is entitled to a presumption of irreparable harm based on its showing of a likelihood of success on the merits.  Topline's ten-month "delay" in filing suit and in filing the motion for preliminary injunction was justified in light of its repeated objections to Modextil's plans, its attempts to resolve the dispute without court intervention, and its investigation of the facts necessary to support its allegations.

### 3. <u>Balance of Hardships</u>

Modextil argues that the orders will be canceled and its reputation ruined if the goods are not timely delivered.  Abitan Decl. ¶ 19.  Topline responds that Modextil chose to continue its expansion into REPORT COLLECTION women's apparel despite Topline's registered trademarks and despite Topline's objections to Modextil's plans, lodged as early as August 4, 2006.  Indeed, Modextil continued its expansion efforts – through its presence at trade shows, its advertising expenditures, its hiring of sales representatives, and its booking of sales – into 2007 despite Topline's oral and written objections.  Topline should not be faulted for now trying to stop Modextil's expansion through court intervention after having duly made objections and after having tried to privately resolve the dispute.  See <u>Ty, Inc. v. Jones Group, Inc.</u>, 237 F.3d 891, 903 (7th Cir. 2001) (finding that defendant, who went ahead with its production despite having been sent a cease and desist letter, knowing full well it may face legal challenges to its product and in turn negative financial consequences, cannot now complain that having to mend its ways will be too expensive).

Topline also argues that Modextil can mitigate its damages by rebranding.  Facing the same issue, one district court noted that a defendant who is preliminarily enjoined from selling shoes with an allegedly infringing mark "need not destroy its shoes on hand," and may resume selling the shoes if it is ultimately successful at trial.  <u>The Villager</u>, 256 F. Supp. at 699.  "In addition, the Defendant for a moderate cost may modify the sock lining of the shoe and use new shoe boxes, both bearing a trademark other than [the allegedly infringing mark] and presently sell the shoes in its normal course of business."  <u>Id.</u>  That court concluded that the "inconvenience and expense [of rebranding] is small in comparison to the damage the Plaintiff is likely to suffer."  <u>Id.</u>  Another court, however, noted that changing the brand or ceasing to sell one's products are both "burdensome" options.  <u>Ty</u>, 237 F.3d at 902.  The Court has no evidence to make a finding regarding the ease or difficulty of rebranding or the costs to Modextil if forced to cease selling its REPORT COLLECTION women's apparel until the conclusion of the case.

The balance of hardships weighs in favor of Topline because Modextil's asserted damages – monetary damages as well as damage to its reputation – could have been mitigated by responding earlier and more definitively to Topline's objections, and can possibly be mitigated in the future through rebranding efforts.  Both companies' reputations are at risk – Topline's reputation because it is likely to be erroneously associated with Modextil's REPORT COLLECTION products, the quality of which it will have no control over, and Modextil's reputation because it may become known for not being able to fill its sales orders.

### 4.   **Public Interest**

Modextil argues that the public interest weighs against enjoining Modextil, who is merely trying to legitimately expand its business across gender lines.  That argument fails in light of the Court's finding of a likelihood of success on the merits for Topline's trademark infringement and unfair competition claims and the presumption of irreparable harm.  A preliminary injunction protects not only Topline's interests in maintaining control over its trademarks and avoiding injury to its reputation and goodwill, but more importantly protects the public interest in avoiding consumer confusion.  See Brookfield, 174 F.3d at 1066 ("preliminary injunctive relief is appropriate . . . to promote the public interest in protecting trademarks generally").

### 5.   **Conclusion**

Topline is likely to succeed on the merits of its Lanham Act claims.  There is a presumption of irreparable harm that Modextil has failed to rebut.  The balance of hardships and public interest tip in Topline's favor.  Accordingly, the Court issued a preliminary injunction, docket no. 37, enjoining Modextil's use of the REPORT COLLECTION mark in connection with the advertising and sale of women's clothing.

## C.   **Bond**

"No . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  Bond amounts vary widely from case to case, even within the trademark infringement arena.  See, e.g., GoTo.com, 202 F.3d at 1211 (upholding $25,000 bond requirement, despite the defendant's request for $20 million bond); Brookfield, 174 F.3d at 1043-44 (rejecting the defendant's request to increase the bond from $25,000 to $400,000); Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc., 16 F.3d 1032, 1034 (9th Cir. 1994) (requiring the plaintiff to post a $100,000 bond as security for the injunction, which was later raised to $5 million and then to $15 million); see also A&M

ORDER   20–

1  Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1028 (9th Cir. 2001) ($5 million bond in
2  copyright infringement case).

3      Topline proposes a bond of $10,000.  Proposed Order, docket no. 3, at 4.  Modextil
4  proposes a bond of $20 million, based on Modextil's projected "lost sales and profits, lost
   investment, and irreparable harm to its reputation in the event it is wrongfully enjoined."
5  Defs.' Opp'n at 24.  Modextil's President claims that the company has invested $1.2 million
6  in REPORT COLLECTION women's apparel, and that Modextil expects $2.1 million retail
7  sales in the fall of 2007 and spring of 2008.  Abitan Decl. ¶¶ 10, 19.  Topline argues that
   "Modextil's ability to move to another brand and preserve its investments . . . demonstrates
8  there is no justification for the $20 million bond it suggests."  Pls.' Reply, docket no. 27, at
9  10.  Having considered Modextil's investment, its projected sales, and the possibility for
10 mitigation of damages, the Court required Topline to post a bond in the amount of one
   million dollars ($1,000,000).  The Court believes this amount adequately protects Modextil's
11 interests.

## CONCLUSION

12      The Court GRANTED Plaintiffs' Motion for Preliminary Injunction, docket no. 3,
13 and issued a Preliminary Injunction, docket no. 37.

14

15      IT IS SO ORDERED.
        DATED this 13th day of August, 2007.

16

17

18      _____
        Thomas S. Zilly
19      United States District Judge

20

21

22

23

24

25

26

ORDER   21–